**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charmaine Ciancio, *et al.*, | No. CV-21-02224-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Plaintiff Charmaine Ciancio brought this case against Defendant the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), for the allegedly negligent operation of a motor vehicle.[1] (Doc. 1, Compl.) After holding a bench trial on July 16, 2024 (Docs. 71–75), the Court now provides its Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52(a)(1). In this Order, the Court will also resolve Defendant's Oral Motion for Directed Verdict (Doc. 70) under Rule 52(c).

**I.    FINDINGS OF FACT**

Plaintiff is a 67-year-old married woman with three daughters. (7/16/2024 Bench Trial Transcript ("Tr.") at 23.) In 2013, Plaintiff and her husband Tim moved to Wellton, Arizona from California, where she had worked as a cardiology technician at a trauma center for 25 years. (Tr. at 23, 29.) Plaintiff has raised, ridden, and trained horses since she was a child, and after moving to Arizona, she began riding mules because she feels they

---

[1] Timothy Ciancio, husband to Charmaine Ciancio, was originally a co-Plaintiff, but the Court dismissed him as a party on the parties' stipulation. (Doc. 31.)

1  are better suited for the desert terrain and tend to spook less. (Tr. at 24–25.) She uses care
2  in purchasing mules to ride, taking into consideration their background and training, and it
3  was with this level of care that she purchased a mule named Leroy from a Missouri mule
4  producer and trainer in 2018. (Tr. at 25–27.) She found Leroy to be "perfect" because he
5  is the right size, sensible, and obedient. (Tr. at 26.) Before the incident in question in this
6  lawsuit, she rode Leroy regularly for almost 18 months and they "had a lot of miles
7  together." (Tr. at 27.) In her experience, Leroy was a trustworthy and safe mule, and
8  Plaintiff felt comfortable enough with Leroy to let her grandchildren ride him. (Tr. at 27.)
9  She rode Leroy "a couple times a week at least" with her friend and neighbor, Patricia
10 King, who typically rode her horse named Romeo. (Tr. at 28–30.)

11         Wellton, Arizona is located in Yuma County near several United States military
12 facilities. Plaintiff, her husband, and Ms. King all testified that they often see military
13 vehicles traveling on the road on which their homes are located—East County 14th
14 Street—particularly while the military is conducting Weapons and Tactical Instruction
15 ("WTI"), when they hear and see military convoys "day and night." (Tr. at 42, 88, 107.)
16 Plaintiff's husband Tim—a retired Marine—stated the vehicle convoys typically include
17 "M-34 Deuce-and-a-half cargo carriers" as well as water buffalos, equipment and supply
18 trucks, Humvees, and pickup trucks, and they are colored green or desert camo. (Tr. at
19 107.) He and his wife also see "stragglers"—military vehicles by themselves going out and
20 back to the Marine Corps Air Station ("MCAS") Yuma to resupply or change vehicles or
21 personnel. (Tr. at 108.) He testified he has called the MCAS Provost Marshal's office on
22 numerous occasions to try "to get them to slow down their vehicles traveling on County
23 14th Street because they're constantly speeding; it's a 40-mile-an-hour residential road and
24 they just don't abide by it." (Tr. at 111.) When asked why he called the Provost Marshal in
25 particular, Tim responded that he understood that a person in the Provost Marshal's office
26 was "in charge of WTI and could get the message across." (Tr. at 83.)

27         East County 14th Street in Wellton runs east-west along the north boundary of the
28 military air and bombing range and, in the relevant area, the road is paved for two miles

before it turns to dirt. (Tr. at 106–07; Def.'s Ex. 105.) The houses in which Plaintiff and Ms. King live are located along the paved portion of the road, which has gravel shoulders on each side. (Tr. at 65, 84; Def.s Ex. 105.) The north side of the road is lined with residential properties (including Plaintiff's and Ms. King's) on which people raise horses and other animals, and Tim characterized the road as a very quiet neighborhood except when the military trains for a few months in the spring and fall, when convoys travel the road at all hours. (Tr. at 107; Def.'s Ex. 105.) A four-foot berm lines the shoulder on the south side of the road, and at the time of the incident in question, the south shoulder was covered in thick brush at certain points along the road. (Tr. at 65–66.)

In February 2019, Plaintiff retired from her work as an appraiser for a local assessor's office, and upon retirement she spent a lot of her time riding Leroy. (Tr. at 29–30.) On October 18, 2019—during a period when the military was conducting WTI—Plaintiff, on Leroy, and Ms. King, on Romeo, set off for a morning ride in the eastward direction down East County 14th Street. (Tr. at 35.) Plaintiff testified that she and Ms. King ride along the road to get to the areas where they can do their "major riding," saying "it's the only way to get where we're going." (Tr. at 76.) After riding off road for a couple hours, they headed back in the westward direction down East County 14th Street toward their homes. (Tr. at 35–36.) Around the area where Avenue 28 E—locally referred to as "power line road"—meets East County 14th Street, they heard and then saw a military convoy coming toward them from the west on East County 14th Street, and they directed their animals to a clearing on the south side of the road to wait for the convoy to pass. (Tr. at 36–38; 69-70.) After the convoy passed, they parted ways, with Ms. King headed east toward her home and Plaintiff headed west toward her home, crossing to the north shoulder of East County 14th Street because it had less obstructive brush. (Tr. at 38–39.)

En route to her home, Plaintiff heard another vehicle approaching behind her—from the east—and she turned to see a large, olive-drab military vehicle with large wheels and a canvas-covered back traveling at high speed toward her. (Tr. at 40.) Because the properties on the north side of East County 14th Street are fenced, she thought about trying to find an

- 3 -

open gate in the fencing to retreat to, but the open gate she had passed would require her to travel too far and back in the direction of the oncoming vehicle. (Tr. at 43–46.) She turned Leroy and motioned repeatedly for the vehicle to slow down, but it did not. (Tr. at 44, 46.) So she moved Leroy as close as she could to the chain link fence along the north side of the shoulder and sat deep in the saddle, and as the vehicle approached, she saw soldiers in the cab of the vehicle wearing military helmets and sunglasses. (Tr. at 41, 46–47.) She testified, "I could see their faces and I was sure they could see mine. They were very plain." (Tr. at 41, 47.)

As the vehicle passed, it sprayed gravel from the shoulder on Plaintiff and Leroy. (Tr. at 46.) Plaintiff was "in survival mode" as the vehicle sped past, and she heard gravel clinking on the helmet she was wearing and the chain link fence and felt it hitting her leg. (Tr. at 46–47.) She testified she saw "the wheel of the . . . truck right up against my face, right in front of me, just the big wheel and the green blur as it went past me very close," and the truck's wheels threw dirt and dust from the shoulder into the air. (Tr. at 48.)

Leroy got spooked and took off west, toward Plaintiff's home, veering to the south side of the road and then back to the north side. (Tr. at 48.) At some point in Leroy's panic, Plaintiff got bucked off, landing on her shoulder and hip in the middle of the road facing east. (Tr. at 48–49.) Her glasses were thrown off and her phone was 15 feet in front of her. (Tr. at 49.) She could not pull herself up or stand due to her injuries, so she crawled to her phone to call her husband for help. (Tr. at 49.) Leroy bolted back to the gate at Plaintiff's property. (Tr. at 49.)

Tim jumped in his truck and drove out to the road to help Plaintiff. (Tr. at 51, 110.) He found her "crying and all busted up," and he found her glasses on the other side of the road. (Tr. at 110.) He carried her to the truck and drove her to their property, where he lifted her into a chair because she could not stand or walk. (Tr. at 52, 110-11.) Plaintiff testified that the "pain was intense" and she thought she had fractured her hip. (Tr. at 52.)

Meanwhile, Ms. King had arrived at her own property and was about to put Romeo up when she heard a ruckus and turned to see a cloud of dust down the road. (Tr. at 95.)

- 4 -

1 After putting Romeo up, she called Tim and found out that Plaintiff had been hurt, so she
2 got in her truck and drove over to check on Plaintiff. (Tr. at 95.)

3       Tim immediately called 911 for an ambulance and the Sheriff's Office and the
4 MCAS Provost Marshal to report the incident. (Tr. at 111.) The ambulance arrived at the
5 property and took Plaintiff to the hospital in Yuma, and the Sheriff came to the hospital to
6 take Plaintiff's report just before she was wheeled into the Emergency Room. (Tr. at 52,
7 111; Pl.'s Ex. 6.) (Tr. at 52.) The Provost Marshal took Tim's report of the incident over
8 the phone. (Tr. at 111–12.)

9       At the hospital, Plaintiff reported severe pain in her hip, shoulder, and abdomen,
10 and she was unable to stand or walk. (Tr. at 53.) The hospital medical care staff took several
11 MRIs and CT scans of Plaintiff and ultimately concluded she suffered tendon and ligament
12 injuries and associated swelling in her hip. (Tr. at 53.) They kept Plaintiff in the hospital
13 for four days, administering pain medications and giving her physical and occupational
14 therapy to teach her to stand and walk with a walker. (Tr. at 53–55.) Once home, Plaintiff
15 continued to suffer pain and have trouble walking, which she found humiliating because
16 she could not do any of her normal work at the property, including caring for the horses
17 and mules. (Tr. at 57.) Follow-up care included physical therapy for six to seven weeks
18 and visits to her primary care physician. (Tr. at 58–59.) Plaintiff testified that she has
19 continued to suffer pain in her hip, knee, back, and elbow ever since the incident,
20 particularly when she gets on and off the horse trailer or tractor or tries to lift tack—
21 "everyday things" that she does. (Tr. at 60.) In sum, Plaintiff's medical care bills for the
22 treatment of her injuries resulting from the incident totaled $39,818.85. (Tr. at 142; Pl.'s
23 Exs. 1-5.)

24       In addition, Plaintiff now suffers from nightmares and a frequent fear of riding her
25 horses and mules. (Tr. at 61.) She is unable to ride Leroy anymore, because he spooks or
26 gets nervous anytime he hears the sound of a motor; Leroy is "like a pet now." (Tr. at 61–
27 62, 116.) She also suffers more generalized fear and anxiety, including a fear or lack of
28 desire to travel off the property. (Tr. at 62.)

At some point after the incident, Warrant Officer Antonio Jackson, who Plaintiff and her husband understood to be an investigator from the Marine Corps, came to talk to them and take some pictures. (Tr. at 112.) About three weeks after reporting the incident to the Provost Marshal, Plaintiff filled out a report form at the Provost Marshal's direction. (Tr. at 66–67.) Neither the Sheriff nor the Provost Marshal ever informed Plaintiff or Tim that they uncovered who was driving the vehicle involved in the incident. (Tr. at 66.) At trial, Defendant did not offer the testimony of Warrant Officer Jackson or the results of his investigation.[2]

Since the incident, Tim convinced the county to install horse-and-rider crossing signs in both directions on the road. (Tr. at 116–17.) Santos Guerrero, a Yuma County public works employee, testified that his road maintenance group conducted weed abatement on the shoulders of East County 14th Street one time since the incident, in 2021, the same year that the horse crossing signs were installed. (Tr. at 127–28.)

**II.    ANALYSIS AND CONCLUSIONS OF LAW**

In the Complaint (Doc. 1), Plaintiff brings a single FTCA claim against Defendant alleging that a service member and/or federal employee negligently operated a motor vehicle resulting in her physical injury and emotional pain and suffering. Based on the evidence the parties presented in the bench trial, Plaintiff argues she is entitled to judgment and seeks $88,000 in damages. (Tr. at 136–43, 153–59.) For its part, at the close of Plaintiff's evidence, Defendant moved for a directed verdict under Rule 52(c), arguing that Plaintiff has not established the Court's subject matter jurisdiction because she has not demonstrated a waiver of Defendant's sovereign immunity under the FTCA based on the unknown nature of the vehicle involved in the incident and the driver's identity. (Tr. at 120, 143–46; Doc. 70.) Even if the Court has jurisdiction, Defendant argues Plaintiff has not met her burden to show by a preponderance of evidence that the driver breached a duty

---

[2] Prior to the bench trial, Plaintiff filed a Trial Brief (Doc. 69) informing the Court that Defendant did not provide to Plaintiff a copy of Warrant Officer Jackson's investigation report during discovery, and instead Defendant listed the investigation report on its privilege log.

- 6 -

1  or the breach proximately caused her injuries such that the driver was negligent under
2  Arizona law. (Tr. at 146–53.)

### A. Waiver of Sovereign Immunity

Defendant the United States is amenable to suit only insofar as it has waived its sovereign immunity. *Conrad v. United States*, 447 F.3d 760, 764 (9th Cir. 2006). The FTCA does so "for a discrete class of lawsuits." *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002). Namely, it waives sovereign immunity

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."). In so doing, the FTCA functions "to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not leave just treatment to the caprice and legislative burden of individual private laws." *Indian Towing Co. v. United States*, 350 U.S. 61, 68–69 (1955).

Plaintiff bears the burden of establishing jurisdiction in this case, *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990), and must prove by a preponderance of the evidence that the court possesses jurisdiction, *Bhuiyan v. United States*, 772 F. App'x 564, 564 (9th Cir. 2019). As detailed above, the FTCA requires that, for this case to fall within the Court's subject matter jurisdiction, the driver of the vehicle that caused injury to Plaintiff must have been a federal employee acting within the scope of his office or employment. To that end, Plaintiff, her husband Tim, and Ms. King all testified that they have years of experience seeing United States military vehicles traveling on East County 14th Street, where they live, and at the time of the incident, the military was conducting WTI and military vehicles were traveling the road day and night. Indeed, during their

morning ride on October 18, 2019, Plaintiff and Ms. King had seen a convoy of military vehicles pass by on East County 14th Street just minutes before the incident in question.

As for the specific vehicle that sped by Plaintiff and Leroy, Plaintiff testified with certainty that it was a very large United States military vehicle with "huge" wheels, consistent with others she had seen for years, describing it as "olive drab green" with a back covered in canvas. (Tr. at 40.) She also saw the vehicle's driver and passenger clearly, and they were military service members wearing "camo helmets and sunglasses"; she testified, "I could see their faces and I was sure they could see mine." (Tr. at 41.) The Court found her testimony credible, having benchmarks of credibility such as no apparent tendency to exaggerate or overreach.

For its part, Defendant presented no reliable controverting evidence. Even Defendant's witness Mr. Guerrero, a Yuma County public works employee, testified that there was a lot of military vehicle traffic on East County 14th Street during WTI. (Tr. at 128–29.) To the extent Mr. Guerrero testified that border wall construction trucks have traveled the road (Tr. at 130), Defendant presented no evidence that border wall construction trucks were present anywhere in the vicinity at the time of the incident in question. By contrast, Plaintiff presented reliable testimony not only that she saw with certainty that the vehicle involved in the incident was a military vehicle occupied and driven by military service members, but also that military vehicles were in the area day and night at that time, including the military convoy Plaintiff and Ms. King saw minutes before the incident.

In sum, Plaintiff has shown by a preponderance of the evidence that the driver of the vehicle that Plaintiff claims caused her injuries was a federal employee—that is, a United States military service member—acting within the scope of his office or employment—that is, driving a military vehicle as part of WTI. Accordingly, Plaintiff has demonstrated the Court's subject matter jurisdiction over this matter by way of Defendant's waiver of sovereign immunity under the FTCA, and the Court will deny Defendant's Oral Motion for Directed Verdict (Doc. 70) under Rule 52(c).

**B.     Negligence**

Under the FTCA, courts apply the law of the state "where the act or omission occurred" to determine whether the United States is subject to liability. 28 U.S.C. § 1346(b); *Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985). Therefore, Arizona negligence law is controlling in this case.

Under Arizona common law, "[n]egligence requires proof of a duty owed to the plaintiff, a breach of that duty, an injury proximately caused by that breach, and damage." *Hutto v. Francisco*, 107 P.3d 934, 937 (Ariz. Ct. App. 2005). All drivers in Arizona are required to exercise due care for the safety of others while operating a motor vehicle, and Arizona courts have long recognized a legal duty for motorists to do so. A.R.S. § 28-794; *see Young Candy & Tobacco Co. v. Montoya*, 372 P.2d 703, 704–05 (Ariz. 1962). As cited by the parties at summary judgment, an Arizona statute also provides the following legal requirements when driving a motor vehicle toward a person on a horse:

> A person operating a motor vehicle on a public highway and approaching a horse-drawn vehicle, a horse on which a person is riding or livestock being driven on the highway shall exercise reasonable precaution to prevent frightening and to safeguard the animals and to ensure the safety of persons riding or driving the animals. If the animals appear frightened, the person in control of the vehicle shall reduce its speed and if requested by signal or otherwise shall not proceed further toward the animals unless necessary to avoid accident or injury until the animals appear to be under control.

A.R.S. § 28-858. A plaintiff must prove by a preponderance of the evidence the negligence on the part of the defendant driver. *Sawyer v. People's Freight Lines*, 22 P.2d 1080, 1081 (Ariz. 1933) (stating that the plaintiff—the estate of a horseback rider hit and killed by a truck—could not prove negligence simply based on the showing of injury to the rider but must demonstrate negligence of the truck driver by a preponderance of the evidence).

Defendant argues that Plaintiff has failed to meet her burden of proof that the military vehicle's driver breached the duty to exercise due care or that such a breach caused Plaintiff's injuries. With regard to breach, Plaintiff offered evidence by way of her own testimony, which the Court found credible, that the driver of the military vehicle traveled at a high rate of speed, did not slow down, and veered off the paved portion of the road and

onto the shoulder directly in front of her, spraying gravel that Plaintiff could hear ricocheting off her helmet and the chain link fence and feel on her legs. (Tr. at 46–48; Pl.'s Ex. 6.) While she testified that in the "green blur," she did not see the military vehicle go off the road, she heard and felt it, as her mule Leroy presumably did also. (Tr. at 48.) Plaintiff also reported that the military vehicle left a cloud of dirt in the air as it passed, which Ms. King testified she also saw from her property some distance down the road. Defendant again provided no reliable controverting evidence, in particular to show that the amount of sprayed gravel and flying dirt reported by Plaintiff and Ms. King could have been produced by any other means than the military vehicle driving at a high rate of speed on the shoulder. The Court thus concludes that Plaintiff has demonstrated by a preponderance of the evidence that the military vehicle's driver failed to exercise due care to Plaintiff, mounted on a mule, when he drove at a high speed onto the shoulder in front of her, spraying her and the mule with gravel and flying dirt.

With regard to causation, Plaintiff's testimony clearly shows that Leroy was spooked as a result of the noise of the military vehicle passing at high speed on the shoulder in front of him as well as the sprayed gravel and flying dirt, causing him to bolt and buck Plaintiff off and onto the asphalt. And it is undisputed that Plaintiff's reported injuries, both physical and emotional, were the result. Defendant argued at trial that Plaintiff could have turned Leroy around and headed for an open gate she had passed to try to distance herself from the oncoming military vehicle, but Plaintiff—an experienced rider—credibly testified that she felt the open gate was too far and she would not have been able to direct Leroy in the direction of the military vehicle speeding toward her.[3]

In sum, the Court finds Plaintiff has demonstrated by a preponderance of the evidence that the negligent driving of the military vehicle's driver proximately caused Plaintiff's injuries, and Plaintiff is thus entitled to judgment that Defendant is liable for negligence under the FTCA.

---

[3] Defendant's arguments that the distance from Plaintiff, mounted on Leroy up against the chain link fence, to the edge of the road was something like six feet was not convincing as to causation, considering that the evidence shows the military vehicle drove at high speed onto the shoulder in front of Plaintiff.

### C. Damages

At trial, Plaintiff's counsel argued under the Revised Arizona Jury Instructions that Plaintiff is entitled to recover for her medical bills as well as ongoing pain, discomfort, suffering, and anxiety. (Tr. at 12–15.) Plaintiff's counsel also argued that Plaintiff can recover damages for suffering the loss of enjoyment of life, that is, loss of "the participation in life's activities to the quality and extent normally enjoyed before the injury." (Tr. at 15.) The Court agrees that these are all sources of recoverable damages for negligence under Arizona law.

Indeed, at trial, Defendant did not contest or present controverting evidence as to Plaintiff's request for damages to compensate her for $39,818.85 in medical bills. (Tr. at 142; Pl.'s Exs. 1-5.) Likewise, Defendant did not contest or present controverting evidence as to Plaintiff's request for $88,000 in total damages, comprised of the medical expenses plus pain, suffering, and loss of enjoyment of life. (Tr. at 143.) The Court finds Plaintiff's damages request reasonable and supported by the evidence, and thus will award Plaintiff $88,000 in damages.

Plaintiff may also be entitled to one quarter of her attorneys' fees under 28 U.S.C. § 2678. If Plaintiff contends she is entitled to such attorneys' fees, she may file an application in compliance with the Federal Rules of Civil Procedure and the Local Rules, including LRCiv 54.2, within 30 days of the judgment under 28 U.S.C. § 2412(d)(1)(B).

**IT IS THEREFORE ORDERED** denying Defendant's Oral Motion for Directed Verdict (Doc. 70).

**IT IS FURTHER ORDERED** finding Plaintiff is entitled to judgment on her Federal Tort Claims Act claim against Defendant the United States and awarding Plaintiff $88,000 in damages. If she contends she is entitled to them, Plaintiff may file an Application for a quarter of her attorneys' fees under 28 U.S.C. §§ 2412(d)(1)(B) and 2678 in compliance with the Federal Rules of Civil Procedure and the Local Rules within 30 days of the judgment.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and against Defendant in the amount of $88,000 and close this case.

Dated this 16th day of August, 2024.

_____
Honorable John J. Tuchi
United States District Judge